Clarkson v. Clarkson.

LAVINIA CLARKSON, and THOMAS S. CLARKSON and wife *vs.* A. L. CLARKSON and D. L. CLARKSON, trustees, &c. under the will of Levinus Clarkson, deceased.

A testator, by his will, after making several specific bequests, gave to each of his five children one fifth of the residuum of his estate; the shares of his sons being given absolutely, and those to his two daughters in trust, for life, with direction to the trustees named in the will to invest the same upon real security, or in public stocks, or in the stocks of banking or other incorporated companies, or in the purchase of real estate, at their discretion, and to pay the *interest, dividends* and *proceeds* arising from the said two shares, from time to time, as they should be received, to his daughters, respectively, for life, with remainder over. In 1846 the trustees invested, of the proceeds arising from the two shares devised to the daughters, the sum of $12.600, in the capital stock of the Utica and Schenectady Railroad Company, by purchasing 100 shares thereof at $126 per share; and in 1853, they invested the further sum of $6000 in the capital stock of the Mohawk Valley Railroad Company, by purchasing sixty shares of its stock at par. The shares of the U. and S. Railroad Co. had, since such purchase, paid an annual dividend of ten per cent upon their par value, which dividends were paid over by the trustees, to the *cestuis que trust*. In Dec. 1850, there was paid to the trustees, on the shares of the U. and S. Railroad Co., an extra dividend of 60 per cent in the capital stock of said company, at par, amounting to $6000. In May, 1853, a consolidation of the U. and S. Railroad Co, the Mohawk Valley Railroad Co. and other railroad companies, took place, pursuant to an act of the legislature, and a new corporation was created, styled "The New-York Central Railroad Co." By the terms and conditions of such consolidation the trustees, as holders of stock in the U. and S. and the Mohawk Valley Railroad

Clarkson *v.* Clarkson.

companies, and in lieu thereof, became entitled to, and did receive shares in the Central Railroad Company, equal in number to those held in the two other companies, being 220 shares of $100 each; and they also became entitled to, and did receive, in the bonds or certificates of the Central Railroad Co. the sum of $55 on each of the 220 shares, so held by them in the other companies; which bonds or certificates amounted, nominally, to the sum of $12,100. The Central Railroad stock was worth $115 per share, and the bonds were worth 90 per cent on their par value.

*Held,* 1. That from the terms used in the will it was clear that the testator intended that all the gains, profits, income and proceeds of the two shares of his estate, of whatsoever kind, name or nature, should go to his daughters, as tenants for life. That consequently the sixty per cent stock dividend, made in Dec. 1850, belonged to them; and the trustees were decreed to deliver over to them the said stock, or its substitute, and all income, dividend or increase received thereon, or to pay the value thereof.

2. That with respect to the bonds or certificates of the Central Railroad Company, the case was different; those bonds not being paid to the trustees, either as interest, dividend or proceeds, but as the difference between the value of the stock of the old railroad corporations and that of the new; and that they were therefore to be regarded as capital, the same as though no consolidation transfer had taken place ; except that those bonds, received as the difference for the sixty shares, would follow their principal, and go to the *cestuis que trust.*

3. That a referee should be appointed, to ascertain and report the present value of the remaining 160 shares of the Central Railroad stock held by the trustees, and the value of the remaining bonds or certificates; to the end that, upon the coming in of that report, should the value of such stock and bonds and certificates be equal to the capital invested, or if deficient, upon the tenants for life making up such deficiency, a decree might be entered, directing the trustees to deliver over to the *cestuis que trust* the sixty shares of stock dividend, the bonds and certificates received on the same, and all dividends thereon received by the trustees. HAND, J. dissented.

THIS was an application by the trustees under the will of Levinus Clarkson, deceased, for the direction of the court in the disposition of certain bonds and certificates, received by the trustees, from investments made by them, under the will, on a case agreed upon between the parties and submitted under sec. 372 of the Code of Procedure.

The testator, Levinus Clarkson, died in September, 1845, and left surviving him, his widow and five children, viz. Augustus L., David L., Levinus, jun., Lavinia and Elizabeth, the latter the wife of Thomas S. Clarkson. The will left by said testator was,

in the month of October, after his death, proved and recorded as a will of real and personal estate. The testator, by his will, after providing for his widow and making several specific bequests, disposed of the rest and residue of his estate as follows:

"Item. And as for and concerning all the rest, residue and remainder of any estate, real and personal, whereof I have power to dispose, with their and every of their rights, members and appurtenances in possession, reversion, remainder or expectancy, &c. I give, devise, and bequeath unto my said sons, Augustus L. Clarkson, David L. Clarkson, and Levinus Clarkson, their heirs, executors, administrators and assigns forever, as to three-fifth parts thereof, to and for the only proper use and benefit of the said Augustus L. Clarkson, David L. Clarkson and Levinus Clarkson, their heirs, executors, administrators and assigns forever, to be equally divided between them, share and share alike; and as to the remaining two-fifth parts thereof upon the trusts, and to and for the uses, intents, and purposes hereinafter mentioned, expressed, and declared, as to and for and concerning the same, that is to say: upon trust to put and place the two respective shares and portions of one-fifth part in and to the said residuary estate and premises at interest, in their own name or names, but designating themselves as trustees of my said daughters respectively, either in one entire sum or in parcels, upon real security; or invest the same, in the purchase of public stocks of the United States, or of the state of New-York, or the stock or stocks of banking or other incorporated companies; or in the purchase of real estate, at their discretion, and the same to call in and place out again as aforesaid, as often as they shall think fit; and in trust to pay the *interest, dividends* and *proceeds* arising from the two said respective shares and portions from time to time, as they shall be received, to my said daughters, Elizabeth Clarkson, wife of Thomas S. Clarkson, jun. and Lavinia Clarkson, respectively; for and during the term of their natural lives respectively; and upon the decease of either of said daughters, leaving issue her surviving, then upon trust to assign, transfer and pay over the share and portion of one equal undivided fifth part of my said residuary

estates and premises, which such deceased daughter would have been entitled to, if she had been living, unto the issue of such deceased daughter, at such time and in such manner as they, my said trustees or trustee, for the time being, in their discretion shall think proper. And in case of the death of either of my said daughters, without leaving issue her surviving, then to assign, transfer and pay over the share or portion of one equal undivided fifth part of my said residuary estate and premises, which such deceased child would have been entitled to, if living, unto my three surviving children, and to the issue of such of them as shall then be deceased, leaving issue, equally to be divided between them in such manner that each of my said surviving children shall have one equal share, and the issue of such deceased child shall have a share equal to the share of such surviving child."

After proving and recording the will, the three sons accepted and entered upon the execution of the said trust. Subsequently, Levinus resigned the trust, and was discharged therefrom by an order of the court. In January, 1846, the trustees, in pursuance of the directions of said will, invested in their own names as such trustees, proceeds arising from the two-fifth shares of said testator's estate, the sum of $12,600, in the capital stock of the Utica and Schenectady Railroad Company, by purchasing one hundred shares thereof, at the price of $126 per share ; and in February, 1853, the said trustees invested the further sum of $6000 in the capital stock of the Mohawk Valley Railroad Company, by purchasing sixty shares of its stock of $100 each, at par. The shares of the Utica and Schenectady Railroad have, since the purchase, paid an annual dividend of ten per cent upon their par value, which annual dividend was promptly paid over by the trustees to the *cestuis que trust*. On the 30th day of December, 1850, there was paid to the said trustees, on the shares of the Utica and Schenectady corporation, an extra dividend of sixty per cent on the par value of its stock, in the capital stock of said corporation, at par, amounting to $6000. This dividend still remains in the hands of the trustees. In May, 1853, a consolidation of the Utica and Schenectady Rail-

road Company, the Mohawk Valley Railroad Company and other railroad companies, took place pursuant to an act of the legislature of this state, and a new corporation was created, styled "The New-York Central Railroad Company." By the terms and conditions of such consolidation the said trustees, as holders of stock in the Utica and Schenectady and Mohawk Valley Railroad Companies, and in lieu thereof, became entitled to and did receive shares in the said central company, equal in number to those held in the two other companies, being two hundred and twenty shares of $100 each ; and also became entitled to and did receive in the bonds or certificates of the said central railroad company, the amount of $55 on each of the 220 shares held by them in the said two other companies ; which bonds or certificates amounted nominally to the sum of $12,100. These are still retained by said trustees. The case stipulated that the worth of the central railroad stock was $115 per share, and that of the bonds 90 per cent on their par value.

The *cestuis que trust* claimed that by the will they were entitled to the extra dividend of December 30, 1850, of 60 per cent, in the stock of the Utica and Schenectady Railroad, amounting to $6000, and the interest and dividends arising therefrom; and also to the bonds or certificates of the Central Railroad Company, of 55 per cent premium on the shares of stock held by the said trustees in the old railroad companies at the time of the consolidation, or the value thereof in money; and they asked for an order of this court that the trustees transfer the same to them, or pay the value thereof.

*By the Court*, JAMES, J. This case was submitted under § 372 of the code, without points and without argument; a practice which I cannot recommend, as cases thus submitted are not likely to receive that careful and thorough investigation, so essential to a correct decision, which they might, if the points were properly prepared and presented by counsel. The members of this court have sufficient employment in the discharge of their legitimate duties, without superadding that of attorney and counsel.

Clarkson *v.* Clarkson.

In this case the only question submitted for consideration is, to whom do the extra dividend of stock and the bonds or certificates of stock belong, by the provisions of the will? Or, in other words, shall the trustees deliver these stocks and bonds and certificates over to the *cestuis que trust*, as proceeds and dividends arising from the investment of their shares of the testator's estate; or, shall the same be added to the principal and accumulated, and the interest and dividends arising from such accumulations only be paid over to the cestuis que trust, with the ordinary dividends of the original fund? "In the construction of wills, it is a cardinal rule, that the intention of the testator is to govern, if consistent with the rules of law," and that intention should be ascertained from the whole will taken together, rather than from the language of any particular provision or clause taken by itself. In this case the court are only intrusted with a single clause of the will. It does, however, appear that the testator had, by his will, previous to the insertion of the clause in question, made provision for his widow, and had also made several specific bequests, and then, by this clause, he disposed of all the rest and residue of his estate, by dividing the same into five equal portions, corresponding to the number of his children, giving to each of his sons one share absolutely, and to each of his daughters one share in trust, for life, remainder over, &c.; said two shares in trust are by the trustees " to be put at interest in their own names, as trustees, in one entire sum, or in parcels, on real property;" or " to be invested in the purchase of stocks, or in the purchase of real estate, at their discretion, with the right to call in and place out again, as often as they shall think fit; to pay the *interest, dividends* and *proceeds*, arising from the said two shares, from time to time as they shall be received, to the said two daughters, during their lives," &c. There is nothing in this clause of the will expressly requiring the capital of these two shares to be increased by accumulations arising from the proceeds of the shares themselves; neither is there any thing from which such an intention can be inferred, while there is much tending to the conclusion, that the testator intended that all the profits and income

of every kind and nature whatsoever, arising from those two shares, however invested, should go to the use and benefit of his two daughters, for their maintenance and support, during their natural lives.

The will vested in the trustees the control of the said two shares, and discretionary power either to put the same at interest on real security, or to invest the same in certain stocks, or in real estate. With the proper exercise of that discretion, the *cestui que trust* could not interfere. If it was put at interest on bond and mortgage, they were entitled to the interest; if it was invested in stocks, they were entitled to the dividends; if invested in real estate, they were entitled to the proceeds or profits arising from the investment. This latter might be determined by the sale of the land for an advance, and a reinvestment of the principal as provided by the will.

There are several cases in England in which it has been held that any extraordinary bonus or addition to the usual annual income of stock, which is settled in trust on one for life, with remainder over, must be treated as capital and added to the principal fund, and the income arising from it only paid to the *cestuis que trust*. But this question does not seem to be fully settled there, as is asserted in *Hill on Trustees,* p. 386. The contrary doctrine has been held in two recent cases, *Price* v. *Anderson,* (15 *Simons,* 473,) and *Johnson* v. *Johnson,* (5 *Law and Eq. Rep.* 164.) In the case of *Price* v. *Anderson,* certain insurance stock had been placed in the hands of trustees, for the benefit of a tenant for life, remainder over, &c. The company had for several years declared yearly dividends of $2\frac{1}{2}$ per cent, but in 1846 it declared a dividend of $12\frac{1}{2}$ per cent; it was held that the tenant for life of the stock was entitled to the whole amount. So in *Johnson* v. *Johnson,* the testator had by will bequeathed the whole of his estate to trustees, upon a trust to pay the income to his widow for life, and afterwards divide the capital among his children. Part of the property consisted of a number of shares in an insurance company. In 1848 the company declared a bonus or increased dividend of £10 per share to be added to the usual dividend of £3 per share, making to-

gether £13 per share; held that this bonus was income, and that the *cestui que trust* of the shares was entitled thereto. The leading case, holding a contrary doctrine, is that of *Brander* v. *Brander*, (4 *Ves.* 800,) decided in 1799. In that case the language of the will is not given. It appears that the plaintiff was entitled, under the will, to the residue of the testator's personal estate for life. A part of that estate consisted of £10,000 Bank of England stock. After the death of the testator, the bank, by means of an operation with the government, transferred, as the profits thereof, to the shares of stock held by the estate, £1000 in five per cent annuities. The tenant for life applied to the court, to have those annuities transferred to him. The lord chancellor denied the motion, holding that the said annuities should be considered as capital, and that the tenant for life was only entitled to the dividend arising from the same. The ruling in this case was followed by the house of lords in 1802, in the case of *Irvine* v. *Houston*, which arose upon an extraordinary division of stock by the Bank of Scotland.

Although the principle upon which these cases were decided, was doubted and the reasoning considered unsatisfactory by both Lords Eldon and Erskine, yet they felt bound by the decision of the house of lords in *Irvine* v. *Houston*, and followed that case, the former in the case of *Paris* v. *Paris*, and the latter in that of *Witts* v. *Steere*. In *Paris* v. *Paris*, (10 *Vesey*, 185,) the testator gave to his wife the dividend of £4000, bank stock, during her life, &c. About six years after the testator's death, the bank made its usual half-yearly dividend of 3½ per cent, and in fifteen days after made an extraordinary dividend of 5 per cent. The widow claimed this last dividend as belonging to her. Lord Eldon said, "I confess I do not think I can safely rest upon any distinction between this case and those that have been determined. I have had great difficulty in stating the principle that led to them." But, feeling bound by the decision of the house of lords, he held that the five per cent extraordinary dividend must be treated as capital, the sum invested as principal, and the interest paid to the tenant for life.

*Witts* v. *Steere*, (15 *Vesey*, 363,) was of a similar character.

In that case the testator bequeathed to trustees his bank stock, with authority from time to time, as the same should become due, to receive all the dividends and profits and pay the same and every part thereof unto his daughter during her life, and after her death, remainder to his grandchild. The bank declared an extraordinary dividend of five per cent, in addition to their half-yearly dividend of 3½ per cent, and paid the two at once as so much interest and profits for the half year. The daughter claimed the whole of this dividend. The court, however, under the authorities above cited, held that the 5 per cent extraordinary dividend must be treated as capital. The attorney general, on the argument, insisted that the prior decisions were not supported by law; and the lord chancellor intimated that, were the question an open one, he should hold differently. In this last case the question of the testator's intention was not made a point or discussed.

If the doctrine of these and several other English cases is to be adopted and followed in this country, then the trustees in this case should add all the extra interest, over 7 per cent, and the extra dividends, to the principal, and invest the same as capital; the interest, or dividends, of which (not to exceed 7 per cent, I suppose,) to be paid to the *cestuis que trust.*

But I am not satisfied with those decisions; and there is no sound principle upon which they can be upheld. In the very nature of things, the dividends arising from stock investments, must be fluctuating in amount, depending upon a variety of contingencies, which no wisdom could foresee, or financial skill control.

I am satisfied that these decisions will never be followed in this country, and will be repudiated, if they are not already, in England. In fact, as early as 1807, the force of these decisions was considerably shaken by Lord Eldon in his decision in the case of *Barclay* v. *Wainewright,* (14 *Vesey,* 66.) The case was this. Latham Arnold, by his will, directed the sum of £10,000 to be invested in bank stock in the name of his executors, for his daughter, she to receive the dividends and interest thereof during life, remainder to her children, &c. The investment was made

Clarkson *v.* Clarkson.

accordingly. When the investment was first made, the half yearly dividends were 2½ per cent; they were afterwards increased, first to 3, then to 3½, and in 1806, an additional dividend of 5 per cent was made, and in 1807 a half yearly dividend of 5 per cent was declared.

· The daughter filed her bill to be allowed the whole of this last dividend. It was resisted, on the authority of *Brander* v. *Brander,* and the subsequent authorities above cited, but the lord chancellor, after taking time for consideration, held the *cestui que trust* entitled to the whole 5 per cent. He remarked, " The cases that have been decided, appear to me to differ from this. It would be improper in me to intimate any opinion whether those cases are rightly decided, but I will say that I do not think this court can, without the authority of the house of lords, alter the determination that has been acted upon, in cases to which that determination *clearly applies.*" It would be pretty difficult to point out any distinction between the case of *Barclay* v. *Wainewright* and *Witts* v. *Steere,* except the difference between a dividend of 5 per cent and that of 8½ per cent. It would seem, however, that the courts of chancery, in 1849 and 1850, without the authority of the house of lords, did come to a different determination from that acted upon before the case of *Barclay* v. *Wainewright,* as appears by the cases of *Price* v. *Anderson* and *Johnson* v. *Johnson, (supra.)* Our courts are not bound by these precedents ; but are at liberty to adopt them or not, as they shall seem to be founded upon sound principle. Our judges seem to have so acted in the few cases which have arisen, wherein this principle was in any respect involved. There is no case in which this precise question has been presented. In *Cogswell* v. *Cogswell,* (2 *Edwards,* 240,) the vice chancellor remarked that, " whatever advantage results from an increase in the annual value of the property, in consequence of the lots becoming more valuable as sites for warehouses, the tenants for life are entitled to. On this point there is no doubt." And in a case which arose in Virginia, where " a testator bequeathed one fourth of the residuum of his estate, in trust for his daughter for life, remainder over, &c., it was held that the daughter during

her life was entitled to the whole of the profits of the estate bequeathed, and that no part of the profits should be carried to the principal fund, but that the whole profits should be paid to her. ( *Ware* v. *McCandlish,* 11 *Leigh,* 595.) From the foregoing I conclude that the decisions of *Brander* v. *Brander,* and kindred authorities, are not now regarded as sound law in England; but however that may be, they have never been adopted or recognized as law in this country. In fact trusts for the accumulation of profits, except for the benefit of infants, are prohibited in this state.

We are therefore at liberty in the disposition of these extraordinary dividends, and it is our duty, to ascertain the intention of the testator, and to decide the case in accordance with that intention, if it is not inconsistent with the well established rules of law. Uncontrolled by precedent, and considered upon principle only, the case seems very plain.

The testator gave to each of his five children, one-fifth of the residuum of his estate; to his sons absolutely, to his daughters in trust, for life, with discretion to the trustees to invest and pay over the proceeds to his daughters. No specific fund was mentioned, in which the investment should be made, nor was any specific sum directed to be paid to them annually. The place where to be invested, and the amount to be received, were left indefinite; the latter depending entirely upon the success of the investment. If it was unfortunate, no dividend would be received; if fortunate, an extraordinary dividend might be realized. In the former case, no one would pretend that 7 per cent interest should be made up from the principal. If fortunate, why then take all above .7 per cent, and add to the capital? Could the testator have contemplated either of the suppositions? Clearly not. It should be borne in mind, also, that this railroad stock was not stock left by the testator at his death, having a fixed rate of dividend, and by him devised, in trust, the dividends alone to be paid to the *cestuis que trust;* but stock in which the property devised had been invested by the trustees; and here I think, a distinction may be drawn between this case and that of *Brander* v. *Brander.* The language used by the

Clarkson *v.* Clarkson.

will is extremely broad. The *cestuis que trust* were to have the *interest, dividends* and *proceeds* of the two shares, after they should be put at interest, or invested by the trustees.

The stock payment of 60 per cent made upon this investment, was properly dividends extraordinary in amounts, not in manner of payment; that being a matter of policy with the company. " Dividends," as used in the will, is unqualified; it includes, in its technical sense, as well as in its ordinary and common acceptation,-all distributions to corporators, of the profits of the corporation, whether such distributions are large or small; or whether made at long or short intervals; and without any regard to the manner or place of their declaration, or mode of payment. The testator is presumed to have used words in their natural and primary sense; and from the terms used, in his will, it is clear that he intended that all the gains, profits, income and proceeds of the two shares of his estate, of whatsoever kind, name or nature, should go to his daughters, as tenants for life; and that intention should not be defeated. If the payment of extraordinary dividends has impaired the capital, such capital should be restored by additions from such dividends. The sixty per cent stock dividend, made Dec. 30, 1850, belonged to the tenants for life, and the trustees must be decreed to deliver over to them the said stock or its substitute, and all income, dividend or increase received thereon, or pay the value thereof.

But the case is different with respect to the bonds or certificates of the Central Railroad Company received by the trustees on the 17th of May, 1853. Those bonds were not paid to the trustees, either as interest, dividend or proceeds; but as the difference between the value of the stock of the old railroad corporations and the new, and are therefore to be regarded as capital, the same as though no consolidation transfer had taken place, except that those bonds received as difference for the sixty shares will follow their principal and go the *cestuis que trust.*

Unless the parties otherwise agree, a referee must be appointed, to ascertain the present value of the remaining one hundred and sixty shares of the Central Railroad stock held by the said trustees, and the value of the remaining bonds or certificates,

and report the same to one of the justices of this court.   Upon the coming in of that report, should the value of such stock and bonds and certificates be equal to the capital invested, or if deficient, upon the tenants for life making up such deficiency, a decree will be entered, directing said trustees to deliver over to the *cestuis que trust* the sixty shares of stock dividend, the bonds and certificates received on the same, and all dividends thereon received by said trustees.

HAND, J., dissented.

[WASHINGTON GENERAL TERM, January 1, 1855.   *Hand, Cady, C. L. Allen* and *James,* Justices.]